**WILSON, Estate of, In re**

Ohio Appeals, 2nd Dist, Athens Co
Decided April 24, 1931

Morton, Irwin, Blanchard and TouVelle, Columbus, and R. W. Finsterwald, Athens, for Executrix.

Woolley and Rowland, Athens, and Jones, Jones & Erskine, Steubenville, for Anthony Wilson.

MIDDLETON, J.

It was contended in the Court of Common Pleas that there is no provision of law authorizing an appeal by the complainant from the Probate Court to the Court of Common Pleas, and a motion to that effect was filed by Anthony Wilson, which was overruled and the case thereupon was heard and submitted on the evidence. The appeal was made under the provisions of §11206 GC. It is contended by Anthony Wilson that the provision in that section covering actions against one suspected of having concealed, embezzled or conveyed away the property of a dead person applies only to the party charged, and that the right of appeal only is given to him when there is an order or judgment against him. This interpretation on its face is unreasonable. There is no reason why the legislature should intend to give only one party in one

action the right of appeal when as to all the remaining proceedings and cases provided for no such limitation is made. The history of this statute, however, conclusively establishes the infirmity of this contention. The section as it appeared prior to the codification may be found in 95 O. L. 406. Without quoting the section in full it is sufficient to say that it there appears that the enactment in respect to the clause here in question reads as follows:

"In proceedings against persons suspected of having concealed, embezzled or conveyed away the property of deceased persons."

This was the provision in §6407 R. S. in 1910 prior to the work of the Codifying Commission. That commission in abbreviating the provisions of this section doubtless made the changes now appearing and adopted the word "or," which of course is ordinarily regarded as a disjunctive. However, in the interpretation of statutory law the word "and" may be read "or," and vice versa. This may be done, says Black in his Interpretation of the Law, 2nd Ed., Page 228:

"Whenever the change is necessary to give the statute sense and effect, or to harmonize its different parts, or to carry out the evident intention of the legislature."

By applying this rule to the provision before us the section would read:

"* * * and in proceedings for the sale of real estate to pay debts, and to change the allowance made by appraisers of an estate to a widow, minor child or children, for a year's support, and against one suspected of having concealed, embezzled or conveyed away the property of dead persons."

It is manifest from this section as a whole that in each of its provisions it was intended to designate the action or case and not the party who is to have the right of appeal. That right is provided for fully by the first clause of the section in which right of appeal is given to a person against whom any order, decision or judgment is made, or whom it affects, in the proceedings and cases thereafter named and specified. We conclude that the Court of Common Pleas properly overruled the motion to dismiss the appeal.

The main contention of the administratrix here is that the evidence adduced in the trial court was wholly insufficient to support the claim of Anthony Wilson that he holds the property sought to be recovered by reason of a gift of the same to him by his brother, John L. Wilson. The record discloses that John L. Wilson, the decedent, was afflicted with a cancerous trouble and that on or about April 17, 1928, he was taken to Mount Carmel Hospital in the city of Columbus for examination and treatment. After a short stay in the hospital he was removed to his home in Nelsonville, in this county, and was confined to said home until his death on June 5, 1928. After his death a safety deposit box belonging to him in The Citizens Central Bank of Nelsonville was opened, and it was then discovered that it contained only a promissory note for $8,000 and bonds to the amount of about $5,000 and no other valuable assets. It appears to have been known by the administratrix and other persons that the decedent had owned prior to his death a larger amount of securities than those found in the safety deposit box after his death. We do not regard it necessary to give in detail all the circumstances following the discovery that Anthony Wilson had, during the time that John was confined in the hospital at Columbus, removed from said box bonds to the amount of $25,500. It is sufficient, we think, in this connection to quote the testimony of Anthony as it appears from the record in respect to how, when and under what circumstances said bonds were removed. Anthony testified that about April 22 he visited his brother John in the hospital and after having some conversation with John, the two being alone in the room, that he said (Record, page 76):

" 'Anything else you want, John?' He said 'Yes. That is what I want to talk to you about.' He says 'When you go down in the morning you get hold of Bill Bean and Jim Sharp, and go down to my box and have Bill count you out $20,000 in bonds.' He says, 'I am going to give them to you. You have helped me earn them, and I want you to have them in case anything happens to you and you get sick, or anything happens, you will have something to go on.' I goes down on Sunday night. Monday morning I goes up and pays my taxes and his, and calls Mr. Bean up over the telephone and meets him up at the bank, told him what my brother had told me, and he says 'All right.' Went in and Mr. Sharp was busy at the time, and he says 'You don't need him. You go and get the box'."

Again on the same page of the record the witness said:

"I goes in and gets the box. Went in the directors' room, opened it, took the bonds

out and Mr. Bean counted out $20,000, put the remainder back in the box, took it back and locked it up, and put my bonds in my own box. Got in the machine and went back to the hospital."

On page 77 of the record the witness testified that he returned to the hospital and told his brother John what he had done and that John said "That is all right." The witness then testified that he had no further talk about any bonds until John was returned to his home in Nelsonville when they had a conversation in the room in which his brother was confined, and that the witness complained to his brother about the way the witness' partner in business was acting, one Charles McGill. After having that conversation the witness testified that John said to him (Record, page 78):

" 'You go up to the bank and I want to give you $5,000 in bonds to buy McGill out, and also get $500 to buy a monument for the cemetery lot'; but he says 'Don't buy McGill out until you get your bills straightened up better than they are'. We had talked it over before, several months before. McGill asked $5,000 for his share of the store and I had John before that time go over all the bills."

The witness on page 79 of the record further testified:

"I went up to the bank; got the key where we always kept it and went over to the bank, and got $5,500 in bonds and put them in my box."

There is some further testimony in the record of some conversation between the witness and his brother regarding the negotiability of the bonds but it is of no importance in considering the case. It is well to observe that Bean corroborates the witness as to the taking of the bonds under the circumstances detailed by the witness. In addition to the testimony quoted the record shows that the case was accompanied with the usual testimony of witnesses in cases of this kind and in cases for the construction of wills. There are always one or more witnesses in such cases who are able to testify to declarations and statements made by the decedent which are intended to give the court an understanding of the decedent's attitude in respect to the matters in issue. While it is true that the testimony of witnesses who are known to be close and confidential friends of a decedent in respect to such declarations and statements may be worthy of serious consideration, yet when statements of this character are made by a decedent to one whom it would be natural to suppose would not be selected as a confidential friend, or when witnesses attempt to testify to statements and conversations between a husband and wife of the most confidential character and in the known presence of the witness, it is well to regard such testimony with great caution.

A full consideration of all the evidence and the record in this case leads to the conclusion that Anthony Wilson's right to hold the bonds in question rests wholly on his own testimony. It is the well settled rule of the law that gifts either inter vivos or causa mortis to be effective must be shown by clear and convincing evidence. The record shows that Anthony had full and free access to the safety deposit box (Record, page 21). It was not even necessary for anyone to give any consent to Anthony's right to open this box. He was in control of the key thereto. The fact that he did open and take from the box the bonds in question furnishes no proof of any legal right so to do. The presence of Bean when the first lot to the amount of $20,000 was taken is no proof of Anthony's right to take the bonds, for Bean was there solely at the request of Anthony and had not received and never did receive any instruction or direction from John regarding said bonds and their delivery to Anthony. This fact must be emphasized because Bean testified that subsequent to the taking of the bonds and prior to John's death he was with John two or three times at John's home and the latter never mentioned the subject of the bonds to him. Bean says he never discussed it with John (Record, page 24). Bean's testimony, therefore, adds nothing to Anthony's right to the bonds, and John's silence on this subject when with Bean, and his failure to ever mention the transaction to Bean, raises a question that it is difficult to answer except upon the inference that John was in ignorance of the whole transaction. Bean, it is apparent, was close to John and had the latter's confidence. It would have been a natural and reasonable thing for John to have said something to Bean about this matter when the later was with him. It is apparent from all the testimony in this case that John, if he did all that Anthony said he did, never knew what bonds Anthony had removed from the safety deposit box and never had any knowledge of the identity of the bonds taken by Anthony.

The plain and simple facts in this case are that a safety deposit box, containing

among other securities bonds to the amount of $25,500, was opened and said bonds were removed therefrom; that the party who admittedly took those bonds had free access to said box and could open it at his pleasure without permission or objection; that while the owner of that box and of the bonds was lying ill and unable to leave his bed, from which illness he never recovered, said bonds were taken.

It is the conclusion of this court that the record in this case wholly fails to establish, to that degree of proof required by law, any delivery of said bonds to Anthony Wilson. And this is true whether the alleged gift may be considered as a gift inter vivos or causa mortis. A rule which would establish the validity of gifts under the facts shown in this case would open wide the flood gates to all kinds of fraud and corruption.

We have assumed for the purposes of the case so far that the circumstances presented and detailed by Anthony Wilson are true. We are not persuaded that full credit should be given to the evidence offered by him. It has its infirmities, among and not the least of which was the attempted concealment of the possession of the bonds after the death of John L. Wilson and the misrepresentation made in respect thereto by some of his witnesses. If Anthony Wilson and Bean had full faith and confidence in the bona fides of the gift, and the removal of the bonds under the gift, there was and is no apparent reason why they should have concealed or attempted to conceal the transaction from those who had a just and legal right to know all about it. There are facts in evidence which indicate that John may have desired to make a will and for some unexplained reason failed to do so. We are inclined to believe under all the facts that had John made a will his brother Anthony would have been substantially recognized in that will. They had worked together for years. Anthony's faithfulness to John's business undoubtedly helped John to succeed. There is no reason shown why John was not appreciative of Anthony's services and there is every reason to believe that he was. These facts, however, in no way reflect on the question of delivery. We decide this case, therefore, on the ground that accepting Anthony's story as true his claim is not supported by sufficient evidence and that the judgment of the court below is contrary to law.

Judgment reversed and case remanded to the Court of Common Pleas for further proceedings according to law.

MAUCK, PJ, and BLOSSER, J, concur.