### EVANS, ESTATE OF, In Re

Ohio Appeals, 2nd Dist, Franklin Co

No 3363. Decided Nov 19, 1941

Henry J. Linton, Columbus; Wilbur L. Shull, Columbus, for appellant.

Horace S. Kerr, Columbus, for appellee.

### OPINION

By GEIGER, PJ.

This is an appeal on questions of law from the Probate Court of Franklin County, upon a complaint against Mary T. Jones for concealing assets belonging to the estate of Amanda Evans.

The Court below dismissed the complaint and overruled the motion for a new trial, and notice of an appeal was given and the case lodged in this Court.

Ray Lantz Wooley, as executrix of the estate of Amanda Evans, filed the complaint and sets out as her assignments of error:

First: that the Court erred in refusing to admit evidence tendered on behalf of the executrix;

Second: that the decision of the Court is not sustained by sufficient evidence and is contrary to law;

Third: for other errors of law;

Fourth: in overruling the motion to set aside the judgment; and

Fifth: for other manifest errors.

The proceeding was brought pursuant to §10506-67 GC against Mary T. Jones who was cited to testify with respect to certain diamonds of considerable value which are described in the complaint and which were left with Mary T. Jones on the 12th of September, 1939. The appellant asserts that the diamonds were left with Mary T. Jones for safekeeping and are a part of the estate of Amanda L. Evans, deceased. Mary T. Jones claims to be the present owner of the diamonds by reason of a gift from Amanda L. Evans to her, and after hearing the evidence, the Probate Court found that the diamonds in question were the property of Mary T. Jones.

In reference to the first error complained of, that certain evidence was improperly excluded, it is urged that the executrix properly offered certain witnesses as to the statements made by the deceased with reference to the fact that the deceased had left the diamonds with Mary T. Jones for safekeeping only.

### THE LAW.

Sec. 10506-67 GC, provides that upon complaint made to the Probate Court by any person interested in a trust estate against any person suspected of having concealed or conveyed away or of having in possession any effects of the said estate, the Court shall cite the person so suspected to be examined on oath. Sub-sections 68 and 70 provide for the method of examination. Sec. 10506-71 provides that if required by either party the Probate Court shall swear such other witnesses as may be offered touching the matter of such complaint and cause the examination of every such witness including ques-

tions and answers to be reduced to writing.

Counsel for the appellant states that the first query is to the construction of sub-section 71 as to whether or not witnesses called by the executrix can testify as to statements made by the deceased with reference to the diamonds.

It is the contention of counsel that the statute makes exception to the hearsay rule.

It may be well, for the moment, to re-examine the statutes covering concealed or embezzled assets since they have been amended to some extent in recent years.

Under the former act, the charge was against a person suspected of having concealed, embezzled or conveyed away, and under the present law there appears the provision, not in the old law, "or of being or having been in the possession of any moneys * * * or effects of such estate".

In the case at bar there is no claim of either having concealed, embezzled of conveyed away the diamonds in question but the complaint is that Mary T. Jones is in possession of the diamonds in question to the exclusion of the executrix.

Sec. 10506-70 GC provides that the examination shall be reduced to writing signed by the parties examined, and §10506-71 GC, under the heading "Examination of witnesses",. provides:

"If required by either party, the probate court shall swear such other witness or witnesses as may be offered by either party touching the matter of such complaint, and cause the examination of every such witness, including questions and answers, to be reduced to writing, signed by the witness, and filed as aforesaid."

Section 10506-73 GC, provides, in substance, for the judgment of the court where one is found guilty of being in the possession of effects of the estate. It provides that the Court shall have authority to cite into court all persons claiming any interest in the assets and shall have authority to hear and determine questions of title relating to such assets and upon being found guilty shall be assessed a 10% penalty.

The change in §10506-73 from the corresponding former section, among other things, is that the court is now given authority to hear and determine "the questions of title".

The old section was under consideration in the case of **Halloran v Merritt, 48 Oh Ap 135,** in which it was held that the proceedings were special and summary in nature, not a civil action within the meaning of the Code and were limited to purposes specified by the statute.

Another case to which our attention is called is **Robertson v Polter, 58 Oh Ap 204,** wherein it is held:

"Sec. 11495 GC, prohibiting a party to an action from testifying in certain instances has no application to proceedings had upon. a citation made upon complaint of an executor under §10506-67 GC, relative to discovery of concealed or embezzled assets, and does not prohibit the party so cited from testifying as to transactions with the executor's decedent."

After the court in the instant case found that the complaint should be dismissed the executrix took proper steps to bring it before this Court and assigned errors as heretofore stated.

The important assignment of error is, first, whether or not the Court improperly excluded evidence and, next, whether the judgment of the Court was sustained by sufficient evidence.

Mary T. Jones testified that possibly a week or two before Mrs. Evans went to the hospital Miss Smith brought the diamonds to her (Mrs. Jones) at her office and that she then put them in her deposit vault where she kept them until after Mrs. Evans died. On examination at a later date she admitted that the diamonds were sent to her on September 18th, the very day Mrs. Evans went to the hospital. This date she fixed from the fact that that was the date on which her lock box was opened. There were ten pieces of jew-

erly which were not produced in court, but are admitted to be in the possession of Mrs. Jones. The jewels are described, and included a Scottish Rite ring. Mrs. Jones stated that on the day the diamonds were delivered Mrs. Evans called her and told her to stay at her office until Miss Smith came with a package, stating, "They are my diamonds" meaning Mrs. Evans' diamonds. Miss Smith not arriving as promptly as expected Mrs. Jones called Mrs. Evans, who seemed quite disturbed because of her nonarrival. Upon Miss Smith later arriving the package was opened and the diamonds checked. Mrs. Jones admits the diamonds were then delivered to her by Miss Smith for the purpose of safekeeping, but stated that later she called Mrs. Evans after the diamonds had been delivered and told her that they were there. Thereupon Mrs. Evans said "That is O. K. Jones, they are yours, you keep them". and she states that at other times Mrs. Evans told her they were hers (Mrs. Jones'). That first happened on the day of their delivery. She later talked to Mrs. Evans in her (Mrs. Jones') office before Mrs. Evans went to the hospital, in the presence of Mr. Hamilton. Upon Hamilton making some jocular remark about desiring the Scottish Rite ring, Mrs. Jones testified that Mrs. Evans turned to her and said, "No, Jones, they are yours". Mrs. Evans in speaking of her serious heart attack stated to Mrs. Jones, according to her testimony, "This is going to get me some day. Those diamonds are yours, you keep them". At another time Mrs. Evans said to her, when inquired of as to why she had not worn the diamonds at a certain function, "Mrs. Jones, I am not wearing them any more. They are yours, you keep them". The same statement was repeated on other occasions as late as a few days before Mrs. Evans died.

Inasmuch as the question of the proper exclusion or admission of evidence may have an important bearing on the correct determination of this case we deem it necessary to set forth in the briefest way possible the testimony offered by the various witnesses, some of which was excluded and some admitted. We have already set out in sufficient detail the testimony of Mrs. Jones, for the present.

Isabel Smith, the messenger who carried the diamonds to Mrs. Jones, states that on September 12, 1939, Mrs. Evans requested that she deliver a package addressed to Mrs. Jones' business address on North High Street. Mrs. Evans said to her, "Will you kindly deliver this package which contains diamonds to the address on the outside. It contains my diamonds which I wish to give to Mrs. Jones to place in her safety deposit vault until I return from the hospital." Miss Smith then testifies that she carried the diamonds to Mrs. Jones, but stopped on the way at the beauty parlor and admits that while there she unwrapped the diamonds and displayed some of them to the employees. She states that Mrs. Jones telephoned to her while she was still at the beauty parlor and suggested that Miss Smith meet Mrs. Jones at the bank in order to deliver the diamonds. Miss Smith demurred on the ground that she did not know what Mrs. Jones looked like and stated that they had better meet at Mrs. Jones' office, which was agreed to. Miss Smith upon arriving at the office requested Mrs. Jones to open the package in her presence, to which Mrs. Jones replied, "I will". Miss Smith states that Mrs. Evans went to the hospital the very day or on the following day after the delivery of the diamonds. Miss Smith was asked, "Did you ever have any talk with Mrs. Evans with reference to her diamonds after you had delivered them to Mrs. Jones", to which she answered in the affirmative and to which Mr. Kerr, counsel for Mrs. Jones, objected. The Court ruled that she might state that she had a conversation and upon being inquired of as to what the conversation was, objection was made and sustained on the ground that such testimony was hearsay, the court stating that declarations against interest are admissible and others are not. The Court permitted counsel to read into the record to what he expected Miss Smith to testify and counsel stated that he ex-

pected the record to show that the witness was with Mrs. Evans at the Neil House and that the witness said to Mrs. Evans, calling attention to another woman's diamond, "You ought to have your own jewelry to flash back", and Mrs. Evans said in response, "Yes, I must get my diamonds back from Jones". Miss Smith did not know anything about the conversation that took place between Mrs. Evans and Mrs. Jones after the delivery of the diamonds to Mrs. Jones.

Upon re-examination Miss Smith was asked if she recalled another conversation with Mrs. Evans with reference to the diamonds, to which she replied that she did and the court sustained an objection to its introduction. Thereupon counsel stated that they expected, if the witness were permitted to answer, that she would have said that Mrs. Evans was asked why she did not have her diamonds and Mrs. Evans said that she had not gotten them from Jones yet, and that she would wear her pearls instead, and stated further that it was too late for Jones to bring her diamonds down to her.

Mrs. Wooley, a sister of Mrs. Evans and the executrix of the estate, testifies that she was familiar with the diamonds and had often seen them and in July her sister made a statement to her. This was excluded upon objection of counsel for Mrs. Jones. Thereupon it was stated that the witness, if permitted to answer, would have testified that Mrs. Evans showed the witness where the diamonds were hidden in case anything would happen to her. That no one but Mrs. Evans and the witness knew the place of concealment and Mrs. Evans stated, "She intended for me to have them. They were mine". Mrs. Wooley saw her sister two weeks before she died at Mt. Carmel Hospital. She testified that she had a conversation about different things and during the conversation Mrs. Evans said, "Mrs. Jones has the diamonds in her safety deposit vault for safekeeping". The Court sustained the objection and the witness continued stating that she asked her sister if she thought the diamonds would be all right, to which her sister replied, "Absolutely, because Jones is honest". The witness further stated she saw her sister two weeks before she died and she showed her where the diamonds were kept hidden in the china closet. She next visited her sister on Sunday morning and found that she had died. She stated that the day after the appraisal, approximately on December 22nd, she had a conversation with Mrs. Jones in which Mrs. Jones revealed to her her claim that, "Amanda (Mrs. Evans) gave me the diamonds". Thereupon the witness said, "That is positively not true and you know it. I know positively that Amanda did not give you the diamonds", and Mrs. Jones said, "All right, if you think she did not give the diamonds to me, possession is nine-tenths of the law and I will spread them on the table and you will pay a big inheritance tax on them". Mrs. Wooley testified that Mrs. Jones stated that if she would just calm down a little bit, they would talk this thing over and Mrs. Jones said, "The only thing I would like to have of the whole business is that small brooch", to which Mrs. Wooley replied, that for friendship's sake she would be willing to give her the brooch but stated to Mrs Jones, "You must give up the rest of them", to which Mrs. Jones replied, "I will tell you what I will do, I will hold these diamonds for a while, then I will give them back to you". Mrs. Wooley trusted her statement and repeated that at that time Mrs. Jones promised to turn the diamonds over to her. Mrs. Wooley stated that though she was the executrix Mrs. Jones managed the appraisal, selecting the appraisers and the lawyers. Mrs. Wooley stated that the appraisers asked whether there was any other property at the time they made the inventory and one appraiser asked, "Was there any jewelry", and Mrs. Wooley stated that before she had a chance to say one word, Mrs. Jones spoke up and said, "No, she gave that away before she died". Mrs. Jones motioned to Mrs. Wooley to keep still, which she did. Mrs. Wooley testified that she

spoke to Mrs. Jones about a Masonic ring and fraternity pin which were to go to her nephew because they belonged to him, whereupon Mrs. Jones stated, "Oh, that can wait until we get ready to send them". Mrs. Jones also gave up several rings after Mrs. Wooley had had a conversation with her. Mrs. Wooley had not insisted on Mrs. Jones returning the rest of the diamonds at that time as she thought she was honest and that she knew the diamonds did not belong to her. Mrs. Wooley was asked, "Did Mrs. Jones at any time agree to turn the diamonds over to you?" A. "Absolutely she did." That was the day after the appraisal. Mrs. Wooley testifies Mrs. Jones stated, "We will just wait a while and I will turn the diamonds over to you." Mrs. Wooley stated, "I fully expected her to and she knew I expected her to." The next conversation Mrs. Wooley had with Mrs. Jones was two weeks before she testified. Mrs. Jones had been the agent for Mrs. Wooley and Mrs. Wooley was dissatisfied and requested the keys to her rental houses be sent back to her and stated, "Now when you are sending out the keys and the statement, you will send the diamonds, won't you, Mrs. Jones?" Mrs. Jones said. "I will not", and I said, "Why?" and she said, "Because they do not belong to you. They belong to me." Mrs. Wooley said, "How do you figure that," to which Mrs. Jones said, "Amanda gave them to me." Mrs. Wooley testifies that on the last day she saw Mrs. Jones she stated, "You will send out the diamonds when you send the keys, will you not?" and Mrs. Jones said, "I will not," to which Mrs. Wooley replied, "Is that final," and Mrs. Jones said, "Yes, that is final," to which Mrs. Wooley replied, "Then we will let the court decide."

This evidence was not objected to, and the Court made no ruling.

During the cross-examination of Mrs. Wooley the Court observed,

"It is a question as to who owns them; Mrs. Jones has them in her possession and they are claimed to be the property of this estate. The court has to determine."

Charles J. Wooley, offered as a witness to a conversation between his wife, the executrix, and Mrs. Evans with reference to the diamonds, after stating that he had heard a conversation, was asked what it was. To this an objection was made and sustained and counsel for the executrix stated that he expected the record to show that Mrs. Evans said to Mrs. Wooley that "Jones had her diamonds in a safety deposit box for safekeeping".

Bess L. Michelson, a sister of decedent, was offered as a witness to a conversation she had with her sister, Mrs. Evans, about eight o'clock in the evening of the day on which she died, on December 16th. She was asked, what, if anything, her sister told her. This was objected to and the objection sustained and the record was made to the effect that she would testify, "I have sent my diamonds down to Mrs. Jones to keep in her safety deposit box for safekeeping," to which Mrs. Michelson replied, "Do you think it is the thing to do? Why don't you put them in your own box?" to which Mrs. Evans replied, "I have no box, Mrs. Jones will do what is right." Mrs. Michelson stated that she went to Steubenville with the body and that Mrs. Jones also went on the same train with her. She was asked as to a conversation she had with Mrs. Jones on the trip to the funeral and stated that they were talking about Amanda's diamonds and she (Mrs. Jones) said, "Of course, she had them for safekeeping." "Q. Did Mrs. Jones tell you that she had the diamonds for safekeeping? A. Yes, she did." Mrs. Michelson stated that she said to Mrs. Jones, "I wish Ray would give me one of Amanda's diamonds, I would like to have one, I would also like to have the little lavaliere for my little granddaughter, as my sister had at one time willed that to her," to which Mrs. Jones replied, "I only have the diamonds for safekeeping, and I will tell Ray what you say."

In support of Mrs. Jones' claim to the diamonds, Gilbert Hamilton testified to

**300**

the effect that Miss Smith delivered the diamonds at his office. Miss Smith displayed the diamonds before Mrs. Jones and the witness. Being asked when he saw Mrs. Evans after that transaction, he stated that she came to his office, which was a joint office with Mrs. Jones, just a few days later. At the time he spoke to Mrs. Evans about the Masonic ring and Mrs. Evans said, addressing Mrs. Jones, "Well, Jones, you got the diamonds, keep them, they are yours." He also testified that as one of the appraisers they inquired if there was any other property subject to appraisement and that Mrs. Wooley stated that there was not. He stated that Mrs. Evans came to his office four or five days after Miss Smith delivered the diamonds.

After counsel for the executrix had stated that the executrix was responsible for the collection of the inheritance tax on property that had been given away within two years of the death, counsel for Mrs. Jones stated that he would agree to take the diamonds to a jeweler to be valued for purposes of inheritance tax.

Charles Carlson, an appraiser, testified that Mrs. Wooley, the executrix, stated, after the other property had been appraised that, "There was nothing else".

Mary T. Jones was again examined and denied the statement of Mrs. Wooley that she, Mrs. Jones, had said she would surrender the diamonds and denied that she had ever made the statement that she was holding the diamonds in trust and especially denied the statement of Mrs. Michelson of the conversation held on the train when they were going to the funeral at Steubenville. She testifies as to the alleged conversation in reference to the giving of the lavaliere for the grandchild and that she replied, "Her sister would have to get those diamonds before she could give them away." She again denied that she stated she was holding them for safekeeping, stating that she was holding them because they were hers. She stated that Mrs. Evans did not go to the hospital on the date that Miss Smith brought the diamonds, but a week or ten days later.

This statement she later retracts and admits that the diamonds were brought by Miss Smith on the same day that Mrs. Evans went to the hospital, on the 12th of September. She had stated that the diamonds were given to her in August and reiterates her claim that the diamonds were brought to her at least two weeks prior to the 11th of September. (She later retracted that statement to the effect that the bank box was opened on the 12th of September, the day the diamonds were brought).

There was considerable contradictory testimony in refernce to the way in which the diamonds were wrapped at the time they were brought by Miss Smith and Mrs. Jones submits exhibits indicating that the diamonds were wrapped in handkerchiefs and the whole enclosed in a brown paper, which is offered as an exhibit. As to this exhibit, the handwriting expert testifies that it was impossible to tell whose handwriting appeared on the brown paper, whether that of Mrs. Evans or Mrs. Jones. Other testimony was to the effect that it was Mrs. Evans' handwriting and this was contradicted by Miss Smith. Miss Smith denied that the diamonds were wrapped in the brown paper. There is a controversy as to whether the word appearing before the name of Mrs. Jones on the brown paper was "gift" or "left". An examination of the exhibit confirms the impossibility of telling which word was used. The inscription was either "Gift to Jones from A. L. Evans" or "Left to Jones from A. L. Evans". Whichever it may be, there is doubt in the mind of the Court of the authenticity of this inscription or of this brown paper in which it is alleged the diamonds were wrapped.

Miss Smith denied having seen any of the handkerchiefs exhibited by Mrs. Jones as the containers of the diamonds. Mrs. Wooley testifies that when she saw them they were not contained in the wrappings offered by Mrs. Jones and that she had never seen such wrappings until they were exhibited to her in the stenographer's office.

Mr. Hamilton identifies the exhibits as the wrappings.

From the foregoing recitation of the statements of the various witnesses, some of which was excluded and some admitted. the question of the correctness of the court's ruling is of prime importance. It will be conceded that any evidence that was offered of any statement made by Mrs. Jones against her own interest should have been accepted and that its exclusion would be error, but it appears that all such statements by Mrs. Jones against interest were admitted.

The more difficult question is whether or not it was error on the part of the court to exclude the evidence that was offered as to statements made by Mrs. Evans, the decedent.

Mrs. Jones was clearly a party to this proceeding and under the provisions of §11495 GC, she was not a competent witness. She, however, testified on several points of importance. She could not have testified but for the provisions of §§10506-67-68-70-71 GC.

If it be true that Mrs. Jones was a competent witness to testify as to statements made by Mrs. Evans favorable to herself, and that no testimony could be accepted concerning the statements made by Mrs. Evans during her lifetime, contradicting the evidence of Mrs. Jones, it is evident that the executrix, in such an examination, is put to a decided disadvantage in that Mrs. Jones could testify to as many favorable statements as she wished, made to her in the absence of other witnesses, and no one could offer evidence of the statements of Mrs. Evans to the contrary for the reason that such statements were hearsay. This does not seem to us to offer any adequate means of determining the truth of this controversy.

Evidence offered by Mrs. Jones as to statements made to her by Mrs. Evans were just as much hearsay as were the statements of Mrs. Evans to other witnesses which contradicted the alleged statements made to Mrs. Jones. It seems to be conceded that Mrs. Jones could testify by virtue of the fact that the statute permits her examination,

although it might be a close question as to whether the evidence so given by her should be excluded as hearsay. This question seems not to have been raised during the trial.

If we are obliged to hold that §10506-71 GC, which provides that, if required by either party, the Court shall swear such other witnesses as may be offered and cause their examination to be reduced to writing, is not efficacious in removing the bar against hearsay evidence, then we feel we should search for other principles that might permit the introduction of the evidence of statements made by Mrs. Evans.

In Wigmore's Code of Evidence, 2nd Edition, Rule 150, page 269, it is stated that the extrajudicial assertions not satisfying certain requirements referred to, may, nevertheless be admitted if three general conditions are found fulfilled: (1) A necessity for using it; (2) A circumstance diminishing the risk of untrustworthiness; (3) A testimonial qualification such as would have been required of the person if called as a witness. The author states that the necessity may consist in the unavailability of the other testimony from the same person, as where he is deceased.

On page 288, under Rule 159, we find:

"A statement of any person deceased is admissible in the following cases:

(a) In case of any action brought by or against the representatives or privies in title of the deceased person."

The author states as to the reason and policy for the rule that the person being deceased no living testimony from him can be had. When, further, the circumstances indicate trustworthiness, the principle of the rule already alluded to, underlying the exceptions of the hearsay rule is fulfilled. "This broad exception is an indispensable safety valve to relieve from the otherwise too inflexible limitations of the other exceptions."

On page 328 we find Rule 171 which states:

"The hearsay rule, being designed to test the trustworthiness of testimonial

assertions offered to evidence the matters asserted, does not apply to utterances not so offered; these are therefore admissible (if otherwise relevant and admissible), without being required to satisfy the conditions of the foregoing exceptions.

Such utterances are of four sorts:

(1) Utterances forming a part of the issue;

(2) Utterances forming a verbal part of an act which is in itself otherwise material;

(3) Utterances relevant circumstantially, not testimonially;

(4) Utterances admissible to explain and complete another utterance."

It is stated that where the utterance of specific words is itself a part of the details of the issue, under the substantive law and the pleadings, the utterance may be introduced for that purpose.

On page 329 it is stated:

"Where an utterance forms a verbal part of a person's act or conduct to which some legal effect is attached, it is admissible, provided,

(1) The act or conduct must be independently material in the case;

(2) The act or conduct must be equivocal or ambiguous in tenor, i. e., is not of itself complete in legal significance;

(3) The utterance must aid in giving this legal significance; and

(4) The utterance must accompany in time the act or conduct."

It seems to us clear that utterances of the donor, made at the time of the alleged delivery of the property that constitutes the subject of the gift and at later dates, are of paramount importance. If the donor simply delivered to an individual a piece of personal property, that would not form any basis to determine that a gift was intended. There must be declarations of intention such as are indicated in the **Bolles case, 132 Oh St 21.** We, therefore, are of the opinion that the declarations of Mrs. Evans, made in connection with the alleged delivery of the diamonds, and the purpose of such delivery, are of importance and that their exclusion on the ground that they were hearsay was error. We feel that their admissibility falls clearly within the rules that we have quoted from Wigmore.

An interesting discussion under the title, "Admissions" may be found in Jones on Evidence, 3rd Edition, page 354, et seq.

Under the conditions disclosed in this case, which we have alluded to, we are of the opinion that there was error in excluding the testimony of witnesses offered as to statements made by Mrs. Evans contradicting the statements made by Mrs. Jones.

Without repeating these matters, we are of the opinion that while the hearsay rule may have properly excluded some of the testimony, yet that there were in a number of cases excluded declarations that should have been admitted.

It may be urged that under §10506-67 GC, the broadest scope of examination may be afforded to those seeking to investigate the ownership of property claimed to belong to an estate and that §10506-71 GC, wherein it is provided that if required by either party the court shall swear such witnesses as may be offered and cause their examination to be reduced to writing and signed, means just what it says, that in cases of this kind, where parties offer witnesses, it is the obligation of the court to have all proffered testimony reduced to writing and signed and that the court is without authority to exclude declarations which otherwise might have been excluded as hearsay.

We are not inclined to take this advanced view at this time, although it may have some appeal to our reason.

We find that the court below was mindful of the rule that admissions and declarations against interest may be given in evidence against the declarant, as he seems to have permitted the evidence disclosing declarations by Mrs. Jones which may be interpreted as against her own interest, and the court does not appear to have clearly ex-

cluded any testimony upon the part of Mrs. Jones which was a declaration against interest.

We are urged to make a declaration of our views based on the evidence which the court below permitted to be introduced. The case of **Bolles v Trust Company, 132 Oh St 21,** is cited on this point. It is so comprehensive that we will not attempt to cite from it, but we simply state that in view of our conclusion that the case should be remanded for the introduction of some of the excluded evidence, we refrain at this time from further consideration of that case, but commend it to the consideration of the court below if this case is retried. See also **Flanders v Blandy, 45 Oh St 108; In re Estate of Wilson, 10 Abs 339.**

For the reasons stated, the judgment of the court below is reversed and the cause remanded for further hearing.

BARNES & HORNBECK, JJ., concur in judgment.